IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.    $599,041.97  SEIZED FROM FIRST BANK ACCOUNT 4504012240,
2.    $51,895.54  SEIZED FROM FIRST BANK ACCOUNT 6291211352,
3.    $38,342.11  SEIZED FROM FIRST BANK ACCOUNT 4502870916,  and
4.    $208,000.00  SEIZED FROM PERSHING, LLC ACCOUNT 5HQ-197178,

      Defendants.
_____

**VERIFIED COMPLAINT FOR FORFEITURE *IN REM***
_____

The United States of America, by and through United States Attorney Jason R. Dunn and Assistant United States Attorney Tonya S. Andrews, pursuant to Supplemental Rules for Admiralty, Maritime and Asset Forfeiture Claims G(2), states:

<u>JURISDICTION AND VENUE</u>

1.    The United States of America (the "United States") has commenced this action pursuant to the civil forfeiture provisions of 18 U.S.C. § 981(a)(1)(A) and 21 U.S.C. § 881(a)(6), seeking forfeiture of defendant property based upon violations of 18 U.S.C. §§ 1956 and 1957, and 21 U.S.C. § 801 <u>et seq.</u>  This Court has jurisdiction under 28 U.S.C. §§ 1345 and 1355.

2.    Venue is proper under 21 U.S.C. § 881(j) and 28 U.S.C. § 1395, as the defendant property is located, and the acts described herein occurred, in the District of

Colorado.

<u>DEFENDANT PROPERTY</u>

3.      Defendant property is more fully described as:

a.      $599,041.97 seized from First Bank account 4504012240 (defendant First Bank account #2240) on August 6, 2020.   Defendant First Bank account #2240 is currently in the custody of the United States Marshals Service Denver, Colorado.

b.      $51,895.54 seized from First Bank account 6291211352 (defendant First Bank account #1352) on July 30, 2020.   Defendant First Bank account #1352 is currently in the custody of the United States Marshals Service Denver, Colorado.

c.      $38,342.11 seized from First Bank account 4502870916 (defendant First Bank account #0916) on July 30, 2020.   Defendant First Bank account #0916 is currently in the custody of the United States Marshals Service Denver, Colorado.

d.      $208,000.00 seized from Pershing, LLC brokerage account 5HQ-197178 (defendant Pershing account #7178) on July 31, 2020.   Defendant Pershing account #7178 is currently in the custody of Pershing LLC.

<u>FACTUAL BASIS FOR FORFEITURE</u>

4.      Except as otherwise noted, all of the following facts and information have been discovered through my own investigation and observations, and the observations and investigations of fellow law enforcement officers as reported to me.

**Policies and Guidance for Prescribing Opioids**

5.      Buprenorphine, sold under the brand name Suboxone, is a Controlled Substances Act Schedule III opioid medication, used to treat opioid addiction disorders

and chronic pain.

6.      The *U.S. Department of Health and Human Service*s and the *Center for Substance Abuse and Treatment,* offer guidelines for physicians in the use of Buprenorphine in the treatment of opioid addiction disorders.   Under the guidelines, physicians should, 1) perform an initial screening and assessment of patients with opioid addiction, 2) determine the appropriateness of Buprenorphine treatment for patients with opioid addiction, 3) provide treatment of opioid addiction with Buprenorphine according to established protocols, 4) assess the presence of and arrange for appropriate treatment for any other medical and psychosocial conditions, and 5) determine when to seek specialty addiction treatment.

7.      The Drug Addiction Treatment Act (DATA) permits physicians who meet certain qualifications to treat opioid addiction disorders with Controlled Substances Act Schedule III, IV, or V narcotic medications.   The Office Based Opioid Treatment (OBOT) designation allows primary care, or general health practitioners with a DATA waiver, to dispense or prescribe Schedule III, IV, or V medications approved by the Food and Drug Administration for the treatment of opioid use disorders.

## Background of Investigation

8.      Dr. Todd Dextradeur is a DATA waived physician with an OBOT designation.   Dr. Dextradeur is authorized to treat up to 275 patients per month for maintenance and/or detoxification using Buprenorphine products, through his medical practice, Todd Dextradeur, M.D., P.C.   Dr. Dextradeur's medical office is located at 51 W. 84th Avenue, Suite 300, Thornton, Colorado.

9.     In January 2003, Dr. Dextradeur was the Medical Director for Genesis Recovery and Treatment Services, which sought a DEA registration number as a narcotic abuse treatment program.   While Dr. Dextradeur was the Medical Director, there were numerous violations of state and federal regulations.  By December 2004, Genesis Recovery and Treatment had voluntarily surrendered both its state license and DEA registration number.

<u>2010 Letter of Admonition</u>

10.     In September 2010, DEA investigators conducted a cyclic investigation of Dr. Dextradeur's OBOT program, which at that time was located at 9025 Grant Street, Suite 200, Thornton, Colorado.

11.     The cyclic investigation determined that there were a number of DEA regulation violations at Dr. Dextradeur's medical practice, including: 1) not including the identification number on dispensing records; 2) not making or keeping a controlled-substance inventory of controlled substance prescriptions procured; 3) failing to provide investigators with all controlled substance invoices for a certain period of time; and 4) not having complete and accurate receiving records for the controlled substances procured.

12.     Dr. Dextradeur was issued a Letter of Admonition, which outlined the violations discovered by the cyclic investigation.   Dr. Dextradeur responded to the letter by stating that he would comply with DEA prescribing requirements going forward.

<u>Confidential Sources</u>

13.     Confidential Source #1 (CS#1) told agents with the Colorado North Metro Drug Task Force that Dr. Dextradeur sells any prescription the patient requests, and also

sells blank prescription sheets. CS#1 said that at the initial office visit, Dr. Dextradeur did not conduct a physical examination, did not ask any medical questions, and only asked for photo identification. CS#1 said that he/she paid Dr. Dextradeur $400 in cash for a prescription, and later paid $125 for a refill prescription.

14. After CS#1 had purchased several prescriptions, Dr. Dextradeur then sold CS#1 four blank prescription sheets for $450 in cash. Dr. Dextradeur told CS#1 that if he/she was ever caught filling forged prescriptions, Dr. Dextradeur would claim that the prescription sheets were stolen.

15. Records indicate that CS#1 was prescribed Carisoprodol, Temazepam, and Alprazolam, which are classified as Schedule IV controlled substances. One of these prescriptions when presented to a pharmacy was refused, and when the pharmacist contacted Dr. Dextradeur, he claimed a prescription pad was stolen and that he had filed a report with the Thornton Police Department.

16. Colorado North Metro Drug Task Force was also aware of a second Confidential Source (CS#2), who had purchased blank prescription sheets from Dr. Dextradeur. CS#2 also said that Dr. Dextradeur did not conduct a physical examination at his/her initial visit. Colorado North Metro Drug Task Force obtained information from CS#2's phone that showed text communications between CS#2 and Dr. Dextradeur. CS#2 had Dr. Dextradeur's phone number, saved in his/her phone, and listed the contact as "Dr. Dex".

17. On May 12, 2012, CS#2 sent a text message to Dr. Dextradeur's phone that said, "Hey Dr. Dex. I'm here at your office, I'm just wondering if you'll be here by 930."

CS#2 received the response, "Yep", and received a second text right after with a "$" sign. Dr. Dextradeur responding to CS#2's request for an appointment with a "$" text is consistent with Dr. Dextradeur exchanging cash for prescriptions.

18.     In July 2018, investigators began investigating another of Dr. Dextradeur's patients, identified as P.G., who was thought to be selling Oxycodone pills. During surveillance, P.G. was stopped by law enforcement, and investigators discovered in his/her vehicle, a prescription written by Dr. Dextradeur for another of Dr. Dextradeur's patients, not P.G.

19.     A third Confidential Source (CS#3), who was an associate of P.G., confirmed that P.G. was seeing a pain management doctor, who had initially provided P.G. with two prescriptions for Oxycodone, 10mg tablets, and later upped the dosage to 30mg after a few visits.   CS#3 purchased 9 Oxycodone pills form P.G. for about $1 per milligram.

20.     CS#3 stated that P.G. said he/she had a good relationship with the doctor, and that P.G. had told the doctor that he/she had broken their wrist in order to receive Oxycodone prescriptions.

21.     On September 4, 2018, CS#3 purchased 14 Oxycodone 15mg pills from P.G. for $220.   When CS#3 inquired about the name of his/her doctor, P.G. would not say, and said that the doctor was a bit spooked right now and was reluctant to accept new patients.

22.     A review of PDMP data showed that on August 30, 2018, Dr. Dextradeur prescribed 90 Oxycodone, 15mg tablets to P.G.   The prescription was filled on

6

September 4, 2018.

Patients of Dr. Dextradeur and Sources of Information

23.     From March 2015 to November 2015, undercover investigators made seven purchases of Oxycodone in a separate investigation.   Investigators determined that the sellers of the Oxycodone purchased during that undercover investigation, purchased some of the Oxycodone from a person, identified as C.K., who was a patient of Dr. Dextradeur.

24.     Between September 2014 and January 2020, C.K. was prescribed Oxycodone and Methadone by Dr. Dextradeur.   The seller told investigators that they believed C.K. was using heroin at the time he/she was receiving the Oxycodone and Methadone prescriptions from Dr. Dextradeur.

25.     The prescribing of prescription-controlled substances is usually monitored by the prescriber with urine analysis test to maintain the patient is taking what is prescribed and to verify drugs not prescribed are not being taken by the patient. Dr. Dextradeur should not have been prescribing Oxycodone and Methadone to a heroin user, and if Dr. Dextradeur had been conducting drug tests on this patient he would have known about the heroin use.

26.     C.K. was identified as an active patient being prescribed Oxycodone and Methadone by Dr. Dextradeur for years after the undercover purchases.

27.     Another patient of the previously mentioned doctor, identified as I.C., went to Dr. Dextradeur when he/she could not acquire pain medication from other doctors, as the other doctors had determined that there was nothing wrong with him/her.

28.     Between May 2017 and April 2018, I.C. received prescriptions from Dr.

Dextradeur for Oxycodone, Methadone, Carisoprodol, and Diazepam. Between April 2018 and February 2020, I.C. received prescriptions from Dr. Dextradeur for Oxycodone and Methadone.

29.     In March 2017, investigators interviewed a Source of Information (SOI#1) about SOI#1's knowledge of Suboxone being smuggled into the U.S. Penitentiary located in Florence, Colorado.   SOI#1 had a family member who was incarcerated there, and the inmate told SOI#1 to contact a person identified at L.B., who was a patient of Dr. Dextradeur's.

30.     PDMP data shows that from December 2016 to February 2017, L.B. was prescribed Suboxone twice by Dr. Dextradeur, and each prescription was filled a total of four times, including refills.

31.     SOI#1 subsequently moved in with L.B. as a roommate.   L.B. offered to pay SOI#1 $1,000 for a Suboxone prescription, and directed SOI#1 to see Dr. Dextradeur, which he/she did.   L.B. paid $420 with a money order for SOI#1's initial appointment with Dr. Dextradeur.   L.B. instructed SOI#1 to tell Dr. Dextradeur that he/she had taken Suboxone in the past, even though they had never taken it before.

32.     SOI#1 stated that at the appointment, Dr. Dextradeur did not conduct a physical examination, or take a blood pressure reading, but did take a height and weight measurement and administered a urinalysis test.

33.     In addition to the prescription for Suboxone, Dr. Dextradeur also wrote a prescription for Ambien, even though SOI#1 did not ask for it.   The prescriptions were filled on January 26, 2017, and were paid for with Medicaid.

34.     SOI#1 sold the Suboxone prescription to L.B. for $1,000, and indicated L.B. smuggled the Suboxone into the U.S. Penitentiary in Florence, Colorado.   L.B. attempted to get SOI#1 to obtain additional prescriptions from Dr. Dextradeur, but SOI#1 refused. SOI#1 later recanted parts of his/her story.

35.     In May 2017, investigators interviewed a second Source of Information (SOI#2) about SOI#2's knowledge of Dr. Dextradeur's prescribing of drugs to female dancers in exchange for cash and other things.   According to SOI#2, several female dancers, who also worked as escorts, paid Dr. Dextradeur a flat fee on a monthly basis to obtain monthly prescriptions for controlled substances.

36.     SOI#2 stated that a particular dancer, identified as S.U., was receiving prescription pain medication from Dr. Dextradeur, but did not actually have any medical condition, and only used the prescription drugs to get high.

37.     According to PDMP data, from December 2015 to April 2016, S.U. was prescribed Suboxone by Dr. Dextradeur, and then from April 2016 to April 2018, S.U. was prescribed large quantities of Methadone and Oxycodone by Dr. Dextradeur.   S.U.'s last prescription from Dr. Dextradeur was for 40 Oxycodone 10mg pills, written in December 2019.

38.     Investigators identified another of Dr. Dextradeur's patients, an associate of S.U., identified as P.A., who began receiving prescriptions in January 2015.   P.A. was initially prescribed 60 Oxycodone 15mg tablets, which was later increased to 90 Oxycodone 15mg tablets.   In February 2020, P.A. was prescribed 20 Oxycodone 15mg tablets from Dr. Dextradeur.

39.     In January 2018, investigators interviewed a third Source of Information (SOI#3), who was a patient of Dr. Dextradeur from February 2016 to October 2017.   At the initial patient visit, SOI#3 provided Dr. Dextradeur with his/her medical records, which provided details about previous ankle and knee surgeries.   Dr. Dextradeur checked SOI#3's vital signs and looked at the scars on his/her ankle and knee, but did not discuss medications, alternate therapies, or complete a pain contract, as is done in the normal course of a pain management clinic practice.   SOI#3 paid Dr. Dextradeur $360 for prescriptions for a two-month supply of Oxycodone, Methadone, and Ambien.   SOI#3 states that he/she tried to fill the prescriptions at a King Soopers pharmacy, but the pharmacist refused to fill them.

40.     Subsequent visits to Dr. Dextradeur also did not include a physical examination.   SOI#3 stated that the appointments took 10-15 minutes and Dr. Dextradeur had his/her prescriptions written out in advance.   SOI#3 was charged $320 for each appointment, and the appointments occurred approximately every other month. SOI#3 was given a urinalysis at each appointment to ensure that he/she was taking the prescribed medication, and was not taking any other illicit drugs.   SOI#3 said that he/she never took the Oxycodone or Methadone prescribed by Dr. Dextradeur.

41.     SOI#3 stated that his/her partner, identified as K.M. was also a patient of Dr. Dextradeur.   K.M. was prescribed Oxycodone and Methadone.   SOI#3 said that he/she gave their Methadone prescription to K.M. to use, and both SOI#3 and K.M. sold their Oxycodone pills to a friend for $2,400 a month.

42.     In October 2017, Dr. Dextradeur refused to continue seeing SOI#3 as a

patient because he/she did not test positive for the drugs he prescribed. SOI#3 admitted to law enforcement he/she never took the Oxycodone or Methadone prescribed by Dr. Dextradeur.

43.     In November 2017, K.M entered a rehabilitation facility to receive treatment for drug addiction. After leaving the facility, K.M. went to live with his/her mother in Mississippi, but died on December 25, 2017 from complications of combined drug toxicity.

44.     A review of PDMP data verified the duration and frequency of prescriptions written by Dr. Dextradeur to SOI#3 and K.M.

Information from Pharmacist

45.     On December 28, 2016, Pharmacist Nathan Dorn contacted DEA investigators and stated that he was concerned with Dr. Dextradeur's prescribing practices. Pharmacist Dorn said that many of Dr. Dextradeur's patients were prescribed the same medication; 120 Methadone, 10mg tablets and 120 Oxycodone, 30mg tablets. Pharmacist Dorn stated that many of the patients were receiving the same prescription month after month, but over time were diagnosed with different ailments. Pharmacist Dorn said a lot of the patients did not appear to be in pain, nor did they appear to have impaired mobility. Pharmacist Dorn also noticed a higher number of early refill requests from Dr. Dextradeur's patients.

46.     A review of Prescription Drug Monitoring Program (PDMP) data revealed that between 2013 and 2017, a large number of Dr. Dextradeur's patients were prescribed an Oxycodone and Methadone combination. PDMP data also showed that between December 2016 and March 2020, over 100 patients were receiving this prescription

combination, and in higher doses than recommended by the Center for Disease Control.

Colorado Medical Board Investigation and Disciplinary Action

47.     A disciplinary proceeding was conducted by the *Colorado Medical Board* concerning Dr. Dextradeur's license to practice medicine in the State of Colorado.   On December 10, 2018, Dr. Dextradeur signed a stipulation, admitting to the following findings of the review:

      a.  Dr. Dextradeur provided treatment for chronic pain to multiple patients from 2011 to 2017;

      b.  Dr. Dextradeur exhibited poor risk assessment of patients who were at a moderate to high risk for substance abuse;

      c.  Dr. Dextradeur did not clearly delineate or identify patients as opioid dependent;

      d.  Dr. Dextradeur demonstrated poor understanding of the management of opioid dependence;

      e.  Dr. Dextradeur provided high opioid management that could be dangerous;

      f.  Dr. Dextradeur prescribed doses of opioid medications higher than recommended, combined opioids, benzodiazepines, and Suboxone without coordinating with a psychiatrist, and prescribed Suboxone without induction with initial use;

      g.  Dr. Dextradeur prescribed one patient benzodiazepine after he discovered the patient was taking the medication illegally;

h.  Dr. Dextradeur failed to document regular physical examinations after initial evaluations.   Subsequent follow-ups rarely included physical examinations.   As a result, there was a lack of correlation between the escalating doses of opioids in certain cases and the patients' complaints; and

i.  Dr. Dextradeur also disregarded inconsistent urine drug screens in at least two patients.

48.    Dr. Dextradeur admitted, and the *Colorado Medical Board* found, that the acts and/or omissions described in the factual basis above constitute unprofessional conduct.   Unprofessional conduct is defined in the order as: "Any act or omission which fails to meet generally accepted standards of medical practice" and "Falsifying or repeatedly making incorrect essential entries or repeatedly failing to make essential entries on patient records."

49.    On December 10, 2018, the Colorado Medical Board placed Dr. Dextradeur's medical license on probation for five years.

The Department of Health Care Policy and Financing

50.    The Colorado *Department of Health Care Policy and Financing* (HCPF), is a department of the State of Colorado, responsible for administering the Medicaid program or reimbursement of money for services and prescriptions paid for by Medicaid.   Part of HCPF's operations and management consists of data collection and analysis, to ensure that Medicaid funds are not being fraudulently paid to those billing Medicaid for medical services.   In December 2019, HCPF prepared a report containing Medicaid data analysis

with respect to Dr. Dextradeur.

51.    The report covers Medicaid claims data from January 1, 2012 to September 25, 2019, and compares reimbursement amounts connected with Dr. Dextradeur's prescription claims to the amounts for other prescribers over the same time period.   From January 1, 2012 through September 25, 2019, Dr. Dextradeur ranked 24th in total dispensed volume across all statewide prescribers, and out of a total 31,334 distinct prescriber locations.   Dr. Dextradeur's prescribing was highest in 2017.   From January 1, 2012 to September 25, 2019, the amount of money Medicaid reimbursed for prescriptions to Dr. Dextradeur's patients was $1,692,414.73.

52.    The report concluded that Dr. Dextradeur is an outlier compared to his peers in terms of the amount of controlled substances he prescribes, and stated that "unspecified illness primary diagnosis [sic] represents a significant proportion of [Dr. Dextradeur's] member's medical categorization, in addition to reflection of opioid-related disorders."

53.    The amount of drugs prescribed, and the amounts reimbursed by Medicaid, demonstrate the extent of Dr. Dextradeur's prescribing of controlled substances. That a significant portion of his prescriptions are for "unspecified illness" is consistent with Dr. Dextradeur writing prescriptions outside the course of professional practice, and without a legitimate medical need.

## JULY 2020 SEARCH

54.    On July 30, 2020, a federal search warrant was executed at Dr. Todd Dextradeur's office located at 51 W. 84th Ave, Suite 300, Thornton, CO.   Law enforcement seized patient files of individuals suspected of being prescribed outside the

course of professional practice and not for a legitimate medical purpose.    Other miscellaneous documents were seized and pictures were taken of other documents. Some of the pictures taken were of a notebook that Dr. Dextradeur stated he used to schedule patient appointments.

55.     The notebook is reflective of a drug ledger with denominations next to patient names and totals on the bottom of the page that were then added to the previous week's total.    After a few months, the total at the bottom of the page starts over at zero and are again totaled week to week.

56.     For example, starting on January 6, 2020, there is the number "54,260" on the top of the page.    On each date for January 6th to January 9th, there are the numbers "960," "320," "320," and "320."    On the bottom of the page, there is the number "56,180."    If you add the top number and the subsequent numbers on each date, it equals the number at the bottom of the page (54,260 + 960 + 320 + 320 + 320 = 56,180).    There are only a couple names written on this page.    A similar pattern continues every week from January to July.

57.     The numbers that appear to be totals, that is where the next week starts at "0," noted in this book during the time-period January 2020 to August 2020 are as follows:

- January 30, 2020 – "60,620;"

- March 12, 2020 - "55K;"

- May 21, 2020 -  "57K;"

- July 23, 2020 – "60,770."

These amounts total 233,390, indicating that Dr. Dextradeur had received approximately $233,390 from his patients from January 2020 to July 2020.

58.     Other miscellaneous documents seized or documented at the time of the search warrant relayed warnings of health risks to Dr. Dextradeur of his prescribing of high dosage or Milligram Morphine Equivalents and combinations of drugs.   In particular, numerous notices from Colorado Medicaid, Pharmacies and private insurance companies showed Dr. Dextradeur was notified of the dangerous prescribing for years and he continued to prescribe/ignore these health warnings.   One letter warns: **Medical studies have shown the rates of overdose death of these drugs used concomitantly were up to 10 times higher than use of opioids alone** (stated in bold).   The risk of drug overdose death increases as the daily benzodiazepine dose increases.   The letter goes on to provide FDA warnings, recommendations and potential resources to consult for proper prescribing.

59.     In addition, approximately 411 pre-singed prescriptions were seized from the office.

60.     A letter signed by the "Colorado Evidence-Based DUR Program" was found and photographed.   It is partially covered but part of the letter lists multiple patient names and refers to the prescribing of high "300 Morphine Equivalent Dose" and later refers to published literature with practice guidelines recommending a "dose limit up to 120 MED..."

61.     A sign on the office door, verified Dr. Dextradeur's office hours as 8:00 am to 10:00 am on Monday, Wednesday, and Thursday (a total of 6 hours a week) with

direction to text him the day before.  It also states "Dr. Dex does not replace lost or stolen medications."

## FINANCIAL INVESTIGATION

62.     According to the Colorado Secretary of State, Todd Dextradeur, M.D., P.C., located at 1324 S. Race Street, in Denver, Colorado was incorporated on April 1, 2002. The registered agent is listed as Todd Dextradeur, and the corporation is in good standing.

63.     According to *Colorado Department of Labor and Employment* records, Dr. Dextradeur had the following state W-2 wages reported from Todd Dextradeur, M.D., P.C.:

2008 - $60,000

2009 - $60,000

2010 - $60,000

2011 - $60,000

2012 - $60,000

2013 - $55,000

2014 - $60,000

2015 - $60,000

2016 - $60,000

2017 - $60,000

2018 - $60,000

2019 - $90,000

The total state wages reported for Todd C. Dextradeur from 2008 through 2019 was $745,000.00.

64.    According to the FinCEN database, there were six Currency Transaction Reports (CTRs) filed on Dr. Dextradeur by two different financial institutions, totaling $137,104 in cash transactions.

- On September 17, 2009, a CTR was filed by US Bank, N.A. for a negotiable instrument cashed of $40,000 (cash out).

- On November 2, 2010, a CTR was filed by US Bank, N.A. for a cash deposit of $25,520 (cash in).

- On February 15, 2012, a CTR was filed by US Bank, N.A. for a cash deposit of $18,000 used to purchase a negotiable instrument (cash in).

- On December 19, 2016, a CTR was filed by FirstBank for a cash deposit of $20,000 used to purchase a negotiable instrument (cash in).

- On October 24, 2019, a CTR was filed by FirstBank for a cash deposit of $17,938 used to purchase a negotiable instrument (cash in).

- On January 13, 2020, a CTR was filed by FirstBank for a cash deposit of $15,646 used to purchase a negotiable instrument (cash in).

Facilitating US Bank Personal Account 103673390797

55.    Dr. Dextradeur opened US Bank account 103673390797 on December 2, 2002, and closed the account on April 12, 2018.   Dr. Dextradeur was the sole signatory on the account.   From December 12, 2015 to December 12, 2016, total deposits were $55,678.86.   The majority of the deposits comprised of 58 cash deposits, totaling $55,156,

each ranging from between $400 and $2,990.

56.    From December 22, 2015 to September 21, 2016, there were 14 cash withdrawals from this account, totaling $35,971.69.    Other withdrawals from this account included $12,296.80 in payments to Nationstar Mortgage for the loan on defendant 1324 S. Race Street, and withdrawals funding a retirement account, and a life insurance policy.

57.    On December 19, 2016, a check written to "Todd C. Dextradeur" for $20,000.00, with the comment "Transfer Money" written in the memo section, was deposited to Dr. Dextradeur's personal defendant FirstBank account #2240.

58.    US Bank account 103673390797 was closed on April 12, 2018.

**FirstBank Business Account 6291211352**

59.    Dr. Dextradeur opened FirstBank account 6291211352 (defendant FirstBank account #1352), a business account for his medical practice, Todd Dextradeur, M.D., P.C., on September 11, 2013.    Dr. Dextradeur is the sole signatory on the account.

60.    On February 14, 2019, investigators conducted surveillance of Dr. Dextradeur as he arrived at his medical office in his silver 2012 Lexus convertible.    Dr. Dextradeur was then seen leaving his office with a box of patient files.    Surveillance was maintained as he traveled to the FirstBank branch at 1316 E. Evans Ave, Denver, Colorado. Investigators observed Dr. Dextradeur inside the bank depositing an unknown amount of currency.  Dr. Dextradeur then left FirstBank and was observed traveling to his residence at defendant 1324 S. Race Street.    Financial records were later obtained for this account, which showed that on February 14, 2019, Dr. Dextradeur had deposited $2,000 in cash into defendant FirstBank account #1352.

### Deposits

61.     From January 2016 to September 2019, there were 224 deposits made into defendant FirstBank account #1352, totaling $648,321.32.   Of these 224 deposits, 169 were cash deposits, totaling $323,630.00.

62.     Other sources of deposits identified included checks, money orders and ACH (Automated Clearing House) payments from patients, medical vendors, insurance companies and others, totaling $275,576.62.

63.     There were 20 unidentified deposits into defendant FirstBank account #1352 totaling $39,114.70.   Many of these unidentified deposits may have been "cash deposits" based on the amounts and the rounded numbers of the deposits.

### Withdrawals

64.      From December 2015 to September 2019, there were 601 withdrawals from defendant FirstBank account #1352, totaling $645,792.34.

65.     Seventeen of these withdrawals, totaled $175,000.00, and were deposited into defendant FirstBank account #2240.

66.     In addition, there were 45 withdrawals, totaling $176,390.05, to Todd Dextradeur, as payroll from the business. These withdrawals were deposited into defendant FirstBank account #0916.

67.     Other withdrawals, totaling $284,402.29, appeared to be mostly business related expenses.

68.     On July 30, 2020, $51,895.54 was seized from defendant FirstBank account #1352.

**FirstBank Personal Account 4504012240**

69.     Dr. Dextradeur opened FirstBank account 4504012240 (defendant FirstBank account #2240) on May 11, 2011, and is the sole signatory on the account. This is a personal checking account.

***Deposits***

70.     From January 7, 2016 to September 27, 2019, total deposits were $726,184.08.

71.     This amount includes 185 cash deposits, totaling $229,092.00.   It is likely that these were cash receipts from Dr. Dextradeur's medical practice.

72.     There were an additional 97 deposits in the form of checks or money orders, totaling $57,859.13.   These deposits also appear to be business receipts.

73.     There were 17 deposits, totaling $175,000.00, made from defendant FirstBank account #1352.

74.     In addition, there was a transfer in the amount of $80,000.00 to defendant FirstBank #2240 from defendant FirstBank account #0916 on January 8, 2018.

75.     There were an additional two deposits, totaling $22,154.24, which were sourced from U.S. Bank account #0797.  The first deposit was a check (#279) for $20,000 payable to Todd Dextradeur and deposited on December 19, 2016.  The second deposit was a cashier's check (#0476513518) for $2,154.24 payable to Todd Dextradeur for the closing of US Bank account #0797 and deposited on April 12, 2018.

76.     There were three deposits, totaling $29,000.00, which were transferred from Dr. Dextradeur's Collegiate Peaks Bank account 410046391.   Prior to these

transfers, Collegiate Peaks Bank account 410046391 was funded by an initial deposit of $5,000, and transfers from defendant FirstBank account #2240, totaling $175,000.00.

77. There were other deposits made into FirstBank account #2240, totaling $126,081.31, which were not generated from Todd Dextradeur's medical practice, including but not limited to, individual tax refunds, sale of real estate proceeds, insurance claims and settlements.

78. There was interest income earned and credited to FirstBank account #2240 totaling $6,997.40 from January of 2016 to September of 2019.

***Withdrawals***

79. Withdrawals from defendant FirstBank account #2240 include a transfer of $70,302.78, into another FirstBank account held in the name of "2534 18th Street, LLC", which is a limited liability company which invests in real estate.

80. On December 19, 2016, a check from defendant FirstBank account #2240 was written to Nationstar Mortgage in the amount of $160,684.69, with the comment "Payoff House" written in the memo section. This payment was to pay the remaining mortgage balance on Dr. Dextradeur's residence, defendant 1324 S. Race Street.

81. On January 12, 2018, $114,500.00 was wire transferred to a Citizens First Bank account in The Villages, Florida. This Citizens First Bank account was held in the names Leo A. and Margaret Dextradeur, who are Dr. Dextradeur's parents.

82. On August 6, 2020, $599,041.97 was seized from defendant FirstBank account #2240.

**FirstBank Personal Account 4502870916**

83.     Dr. Dextradeur opened FirstBank account 4502870916 (defendant FirstBank account #0916), a personal account, on May 11, 2011.   Dr. Dextradeur is the sole signatory on the account.

### Deposits

84.     From January 2016 to October 2019, deposits made into defendant FirstBank account #0916, totaled $380,107.31. Of the total $380,107.31 in deposits, there were 45 deposits totaling $176,390.05 in payroll payments to Dr. Dextradeur, which were transferred from defendant FirstBank account #1352.

85.     In   addition, there   were   85   deposits into   FirstBank account #0916, totaling $111,796.28, from "Federal Salary – DFAS," which refers to the Defense Finance and Accounting Services and unrelated to Dextradeur's medical practice.

86.     On January 8, 2018, there was one deposit of $80,000.00, which was transferred from defendant Pershing account #7178.   Defendant Pershing account #7178 had previously been funded by Dr. Dextradeur's Raymond James Financial Services, Inc. account 52450054, discussed in more detail below.

87.     There were an additional 7 miscellaneous deposits totaling $11,920.98 into FirstBank account #0916.

### Withdrawals

88.     From January 4, 2016 to October 2, 2019, there were also 45 transfers from defendant  FirstBank account #0916, totaling $256,000, made to Raymond James account #52420054 and defendant  Pershing account #5HQ-197178,  as described below. These accounts are investment accounts held in Dr. Dextradeur's name.

89.     In addition, there was one transfer to defendant FirstBank account #2240 of $80,000 on January 8, 2018.

90.     On July 30, 2020, $38,342.11 was seized from defendant FirstBank account #0916.

**Pershing LLC Brokerage Account 5HQ-197178**

91.     Dr. Dextradeur opened Pershing LLC Brokerage Account 5HQ-197178 (defendant Pershing account #7178), in July 2017.   Dr. Dextradeur is the sole owner of the account.

92.     The beginning balance of Pershing, LLC Brokerage account #5HQ-197178 on April 1, 2018 was $654,746.51.  The majority of these funds were transferred from Raymond James Capital Access account #52420054, which included $100,000.00 traced from FirstBank account #0916.

93.     From April 2018 to September 2019, deposits made into defendant Pershing account #7178, totaled $213,241.69.   Of these deposits, $100,000.00 was transferred from Dr. Dextradeur's Raymond James account 52450054, which were from defendant FirstBank account #0916.   From April 2, 2018 to September 3, 2019, there were 18 deposits totaling $108,000.00 transferred directly from defendant FirstBank account #0916 to defendant Pershing account #7178.

94.     On July 31, 2020, $208,000.00 was frozen in defendant Pershing account #7178, and remained in the custody of Pershing, LLC.

## **CONCLUSION**

95.    Based on facts and circumstances described above, evidence shows that Dr. Dextradeur distributed controlled substances without a legitimate medical purpose, and outside the course of normal professional practice.   The defendant assets constitute property derived from, or involved in, the illegal distribution of controlled substances, and constitute property involved in money laundering.

VERIFICATION OF MICHAEL TONOZZI
TASK FORCE OFFICER, DRUG ENFORCEMENT ADMINISTRATION

I, Task Force Officer Michael Tonozzi, hereby state and aver under the pains and penalties of perjury that I have read the foregoing Factual Basis for Forfeiture and that the facts and information contained therein are true.

Michael Tonozzi
2021.01.25
09:51:22 -07'00'

_____
Michael Tonozzi
Task Force Officer- DEA

## FIRST CLAIM FOR RELIEF

96.     The Plaintiff repeats and incorporates by reference the paragraphs above.

97.     By the foregoing and other acts, defendant FirstBank account #2240 constitutes property involved in a financial transaction designed to conceal or disguise the nature, the location, the source, the ownership, or the control of proceeds of unlawful activity, and property involved in a monetary transaction in criminally derived property, in violation of 18 U.S.C. §§ 1956 and 1957, and therefore is forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

## SECOND CLAIM FOR RELIEF

98.     The Plaintiff repeats and incorporates by reference the paragraphs above.

99.     By the foregoing and other acts, defendant FirstBank account #2240 constitutes moneys, negotiable instruments, securities, or others things of value furnished, or intended to be furnished by any person, in exchange for a controlled substance, and proceeds traceable to such an exchange, in violation of 21 U.S.C. § 801, et seq., and therefore is forfeitable to the United States pursuant to 21 U.S.C. § 881(a)(6).

## THIRD CLAIM FOR RELIEF

100.    The Plaintiff repeats and incorporates by reference the paragraphs above.

101.    By the foregoing and other acts, defendant FirstBank account #1352 constitutes property involved in a financial transaction designed to conceal or disguise the nature, the location, the source, the ownership, or the control of proceeds of unlawful activity, and property involved in a monetary transaction in criminally derived property, in

violation of 18 U.S.C. §§ 1956 and 1957, and therefore is forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

FOURTH CLAIM FOR RELIEF

102.    The Plaintiff repeats and incorporates by reference the paragraphs above.

103.    By the foregoing and other acts, defendant FirstBank account #1352 constitutes moneys, negotiable instruments, securities, or others things of value furnished, or intended to be furnished by any person, in exchange for a controlled substance, and proceeds traceable to such an exchange, in violation of 21 U.S.C. § 801, et seq., and therefore is forfeitable to the United States pursuant to 21 U.S.C. § 881(a)(6).

FIFTH CLAIM FOR RELIEF

104.    The Plaintiff repeats and incorporates by reference the paragraphs above.

105.    By the foregoing and other acts, defendant FirstBank account #0916 constitutes property involved in a financial transaction designed to conceal or disguise the nature, the location, the source, the ownership, or the control of proceeds of unlawful activity, and property involved in a monetary transaction in criminally derived property, in violation of 18 U.S.C. §§ 1956 and 1957, and therefore is forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

SIXTH CLAIM FOR RELIEF

106.    The Plaintiff repeats and incorporates by reference the paragraphs above.

107.    By the foregoing and other acts, defendant FirstBank account #0916 constitutes moneys, negotiable instruments, securities, or others things of value furnished, or intended to be furnished by any person, in exchange for a controlled

substance, and proceeds traceable to such an exchange, in violation of 21 U.S.C. § 801, et seq., and therefore is forfeitable to the United States pursuant to 21 U.S.C. § 881(a)(6).

## SEVENTH CLAIM FOR RELIEF

108. The Plaintiff repeats and incorporates by reference the paragraphs above.

109. By the foregoing and other acts, defendant Pershing account #7178 constitutes property involved in a financial transaction designed to conceal or disguise the nature, the location, the source, the ownership, or the control of proceeds of unlawful activity, and property involved in a monetary transaction in criminally derived property, in violation of 18 U.S.C. §§ 1956 and 1957, and therefore is forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

## EIGHTH CLAIM FOR RELIEF

110. The Plaintiff repeats and incorporates by reference the paragraphs above.

111. By the foregoing and other acts, defendant Pershing account #7178 constitutes moneys, negotiable instruments, securities, or others things of value furnished, or intended to be furnished by any person, in exchange for a controlled substance, and proceeds traceable to such an exchange, in violation of 21 U.S.C. § 801, et seq., and therefore is forfeitable to the United States pursuant to 21 U.S.C. § 881(a)(6).

WHEREFORE, the United States prays for entry of a final order of forfeiture for the Defendant property in favor of the United States, that the United States be authorized to dispose of the defendant property in accordance with law, and that the Court enter a finding of probable cause for the seizure of the defendant property and issue a Certificate of Reasonable Cause pursuant to 28 U.S.C. § 2465.

DATED this 25th day of January, 2021.

Respectfully submitted,

JASON R. DUNN
United States Attorney

By:  s/ Tonya S. Andrews
Tonya S. Andrews
Assistant United States Attorney
United States Attorney's Office
1801 California Street, Ste. 1600
Denver, Colorado 80202
Telephone: (303) 454-0100
Fax: (303) 454-0402
E-mail: tonya.andrews@usdoj.gov
*Attorney for Plaintiff*